**In the United States District Court
for the District of Kansas**

————————

Case No. 22-cv-3132-TC

————————

RYAN CHRISTOPHER CHEATHAM,

*Plaintiff*

v.

ANDREW DEDEKE, ET AL.,

*Defendants*

————————

## MEMORANDUM AND ORDER

Plaintiff Ryan Cheatham, formerly a pretrial detainee at the Leavenworth County, Kansas, jail and proceeding pro se, sued three jail employees—Judith Beck, Andrew Dedeke, and Melissa Wardrop—alleging that they were deliberately indifferent to his medical needs in violation of the Eighth Amendment. Doc. 251. All parties move for summary judgment. Docs. 293, 296, 301. For the following reasons, Cheatham's motion for summary judgment is denied, and the defendants' motions are granted.[1]

### I

### A

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to

---

[1] Cheatham's motion for an order, Doc. 360, is denied as moot.

decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency that Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(a)–(c). To determine whether a genuine dispute exists, the court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues as to those dispositive matters remain for trial. *Celotex*, 477 U.S. at 324; *Savant Homes*, 809 F.3d at 1137.

The filing of cross-motions for summary judgment does not alter this standard. Each motion—and its material facts—must "be treated separately," meaning that "the denial of one does not require the grant of another." *Atl. Richfield Co. v. Farm Credit Bank Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). All inferences must be construed "in favor of the party against whom the motion under consideration is made." *United States v. Dep't of Health & Env't*, 162 F.4th 1238, 1247 (10th Cir. 2025).

## B

On May 18, 2022, Cheatham was booked into the Leavenworth County, Kansas, jail. Doc. 288 at ¶ 2.a.i.[2] Defendant Melissa Wardrop, a nurse at the jail, conducted an initial medical screening of Cheatham.

---

[2] All document citations are to the document and page number assigned in the CM/ECF system. All facts are uncontroverted unless otherwise specified.

Doc. 297 at ¶¶ 8, 11. Cheatham told Wardrop that he had injured his right pinky finger during booking. *Id.* at ¶ 12. Five days later, Cheatham submitted a grievance complaining that his finger was "messed up." Doc. 298 at 51; Doc. 297 at ¶ 13. He was told to submit a sick call. Doc. 297 at ¶ 13.

Cheatham submitted a sick call complaint on May 30 noting that he could not "bend [his] finger fully." Doc. 298 at 52; Doc. 297 at ¶ 14. Wardrop again evaluated Cheatham and ordered an x-ray. Doc. 297 at ¶ 15. Cheatham had an x-ray on June 1 that showed his finger was not fractured. Doc. 297 at ¶ 16; Doc. 298 at 54. He then submitted a second sick call complaint two days later requesting an MRI scan. Doc. 297 at ¶ 17. He submitted a subsequent complaint on June 11. *Id.* at ¶ 18. Wardrop examined Cheatham on August 11 but made no new orders. *Id.* at ¶ 20. Cheatham submitted two more complaints. *Id.* at ¶¶ 21, 23. On August 30, Defendant Judith Beck, the medical director at the jail, evaluated Cheatham. *Id.* at ¶¶ 9, 24. She ordered pain medication and stress ball exercises. Doc. 297 at ¶ 24. Then on September 6, nurse practitioner Jana Harris evaluated Cheatham's finger and ordered an MRI scan. *Id.* at ¶ 25.

Cheatham had an MRI on October 14. Doc. 297 at ¶ 27. That scan showed that Cheatham's finger had a "[p]ossible high-grade or full-thickness tear of the flexor tendon . . . with retraction of tendon into the deep palmar hand." Doc. 298 at 64. The MRI results noted that "[t]he remaining extensor and flexor tendons are grossly unremarkable." *Id.* Cheatham was referred to orthopedist Robert Haas, who in turn referred him to plastic surgeon Dana Forker. Doc. 297 at ¶¶ 28, 29. After being referred, Cheatham submitted two grievances complaining about why he had not seen Forker. *Id.* at ¶¶ 32, 33.

Cheatham met with Forker on December 5. Doc. 297 at ¶ 34. Forker found that Cheatham had "some pull-through of FDS tendon," and "[n]o FDP tendon pull-through." Doc. 298 at 72. He explained to Cheatham the nature of the injury and what reconstructive surgery would entail. *Id.* at 72. Cheatham decided that he wanted surgery. Doc. 297 at ¶ 36.

On January 31, 2023, Cheatham submitted a complaint noting that it had been "over a month" since he had seen Forker and asking about the "hold up." Doc. 297 at ¶ 41. He submitted another complaint the next day asking whether his grievances would be addressed. *Id.* at ¶ 43. Cheatham was ultimately transferred to the Kansas Department of

Corrections on April 1, 2023. *Id.* at ¶ 52. To date he has not had surgery on his finger. *Id.* at ¶ 62.

Cheatham filed suit in federal court. Doc. 251. He argues that Beck, Wardrop, and Leavenworth County Sheriff Andrew Dedeke violated his Eighth Amendment rights by failing to schedule his finger surgery between December 5, 2022 (when he met with Forker) and April 1, 2023 (when the Kansas Department of Corrections took custody of him).[3] Doc. 288 at ¶ 4.a.i. Defendants Wardrop and Dedeke move for summary judgment arguing that Cheatham did not exhaust his administrative remedies and that they are entitled to qualified immunity. Doc. 296. Defendant Beck separately moves for summary judgment on the same grounds. Doc. 301. And Cheatham requests summary judgment, arguing that there is no dispute that the defendants were deliberately indifferent to his medical needs. Doc. 293.

## II

Cheatham failed to comply with the administrative procedures that govern inmate grievances in Kansas prisons. And the defendants are entitled to qualified immunity. Accordingly, Cheatham's motion for summary judgment is denied, and the defendants' motions are granted.

## A

Invoking 42 U.S.C. § 1983, Cheatham alleges that Beck, Dedeke, and Wardrop were deliberately indifferent to his serious medical needs. Doc. 288 at ¶ 4.a.i. Section 1983 provides that "[e]very person who, under color of [state law,] subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. It creates no substantive rights but merely provides a mechanism for enforcing a right conferred by the Constitution or a federal statute. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002); *see also*

---

[3] Cheatham initially filed suit in June 2022, six months before he saw a surgeon for his finger. Doc. 1. In his initial Complaint he alleged that he was unlawfully denied mental health treatment and medications. *Id.* at 2. He subsequently filed four amended complaints. Docs. 73, 115, 148, 251. His motion to file a fifth amended complaint was denied. Doc. 256. All his claims save for the one of deliberate indifference under the Eighth Amendment were dismissed. Doc. 98.

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 174–75 (2023). Thus, to state a viable Section 1983 claim, a plaintiff must establish that a person, acting under color of state law, caused him or her to be deprived of a right secured by the Constitution or laws of the United States. *See Torres v. Madrid*, 592 U.S. 306, 310 (2021); *accord Medina v. Planned Parenthood of S. Atl.*, 606 U.S. 357, 365 (2025).

There are two general iterations of a Section 1983 claim. One is suing the individual officer directly. That claim is akin to suggesting that the individual officer personally participated in conduct that is alleged to have deprived the plaintiff of an enforceable right, *Cuervo v. Sorenson,* 112 F.4th 1307, 1314 (10th Cir. 2024), failed to intervene while another engaged in unconstitutional conduct, *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022), or failed to supervise others who violated the plaintiff's rights, *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009). The other is by suing either the entity responsible, whether by naming that entity directly or suing the agent of the entity in his or her official capacity. *See generally Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (applying *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *accord Cox v. Glanz*, 800 F.3d 1231, 1254 (10th Cir. 2015). To assert an official-capacity claim, the plaintiff must allege both that his or her harm was caused by a constitutional violation committed by the entity's agent, *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1223 (10th Cir. 2006), and that the entity's custom, policy, or practice caused the unconstitutional conduct, *Monell*, 436 U.S. at 694–95. *See generally Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1048–49 (10th Cir. 2024).

In the ordinary case, there is no exhaustion requirement for Section 1983 claims. *Porter v. Nussle*, 534 U.S. 516, 523–24 (2002) (citing *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 516 (1982)). But that rule is different when a current or former prisoner brings a Section 1983 lawsuit alleging constitutional deprivations while he or she was incarcerated. *Id.* (citing *Wilwording v. Swenson*, 404 U.S. 249 (1971) (per curiam)).

Under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), a prisoner may not bring any claims stemming from prison conditions before exhausting all administrative remedies available to him or her in prison. This applies to pretrial detainees like Cheatham because the definition of a prisoner includes "any person . . . detained in any facility who is accused of . . . violations of criminal law . . . ." 42 U.S.C. § 1997e(h); *accord Carbajal v. McCann*, 808 F. App'x 620, 639 (10th Cir. 2020); *Kalinowski v. Bond*, 358 F.3d 978, 979 (7th Cir. 2004); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 402 (2015) ("[W]e note that the

Prison Litigation Reform Act . . . applies to both pretrial detainees and convicted prisoners.").

The Act does not define the term "prison conditions." *Porter*, 534 U.S. at 525. But the Supreme Court has held that the exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.* at 532. And exhausting administrative remedies means pursuing "[a]ll 'available' remedies . . . [e]ven when the prisoner seeks relief not available in grievance proceedings, notably money damages." *Id.* at 524. Those complaints must be made "in the place, and at the time, the prison's administrative rules require." *Woodford v. Ngo*, 548 U.S. 81, 87 (2006). Proper exhaustion is required, so if administrative remedies are no longer available because the prisoner failed to timely file a grievance or otherwise failed to comply with procedural requirements, he or she has not met the requirements for exhaustion. *Id.* at 92–93.

State prisoners in Kansas are required to exhaust the four-step, sequential administrative remedy program codified in article 15 of chapter 44 of the Kansas Administrative Regulations before bringing Section 1983 claims in federal court. Kan. Admin. Regs. § 44-15-101a(d)(1). Article 15 applies to complaints about prison policies or conditions, actions by employees or inmates, and incidents that occurred inside the corrections facility. *Id.* at § 44-15-101a(d)(1)(A)–(B). It is designed to "incorporate several levels of problem solving to assure solution at the lowest administrative level possible." *Id.* at § 44-15-101(d). So, to fully exhaust an article 15 grievance, a prisoner must first attempt informal resolution of the matter with the personnel "who work with the inmate on a direct or daily basis," then the inmate must file a formal grievance with his or her unit team before appealing to the warden, and then appealing to the Secretary of Corrections. *Id.* at § 44-15-101(b)–(d).

The uncontroverted evidence establishes that Cheatham failed to exhaust his administrative remedies at the Leavenworth County jail. As noted, federal law required him to exhaust all available remedies. *Porter*, 534 U.S. at 524. The Leavenworth County jail required inmates to appeal the denial of a grievance to the Jail Commander. Doc. 297 at ¶ 7. Cheatham did not do so. Doc. 302 at ¶ 18. That failure dooms his claim. *See Thomas v. Parker*, 609 F.3d 1114, 1118–19 (10th Cir. 2010) (affirming the district court's dismissal of a Section 1983 claim because the prisoner did not comply with the state-law grievance process);

*Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (finding that a prisoner who started but did not finish the grievance process was barred from pursuing a section 1983 claim).

Cheatham's counterarguments are unpersuasive. He argues that the jail "[does not] allow an inmate to appeal," that there is "no way to appeal grievances," and that there are "no icons" to appeal on the tablets that inmates use to file grievances. Doc. 304 at 10–11; Doc. 309 at 16. But he provides no evidence to support either of these assertions. *See McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings."). The uncontroverted evidence establishes that Cheatham did not appeal his grievances, Doc. 302 at ¶ 18, and without any evidence that he was unable to appeal his grievances, Cheatham's claim fails. *See Estrada v. Smart*, 107 F.4th 1254, 1262 (10th Cir. 2024) (affirming summary judgment where the plaintiff "offered no evidence to support his allegations about the [prison's] grievance procedures beyond the allegations themselves"), *cert. denied*, 146 S. Ct. 90 (2025).

**B**

The defendants argue that even assuming Cheatham had exhausted his administrative remedies, they are entitled to qualified immunity. Qualified immunity attempts to balance competing interests. Suits against government actors allow those wronged by government misconduct a method of redress. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)). But non-meritorious suits exact a high cost from society and government officials by unduly interfering with the discharge of official duties. *See id.*; *see also Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1277 (10th Cir. 1998). So government officials performing discretionary duties are immune from suit when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable official would have been aware. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (recognizing municipalities may not rely on their officers' entitlement to qualified immunity). Whether an official is immune turns on the objective reasonableness of the official's actions, considering the laws clearly established at the time the official acted. *See Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). Objective reasonableness is not an exacting standard; qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. *See White v. Pauly*, 580 U.S. 73, 79 (2017); *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Once a defendant asserts entitlement to summary judgment on the basis of qualified immunity, the plaintiff has the burden to prove two things. First, the plaintiff must show that a jury could find the defendant's conduct violated the Constitution or laws of the United States. *Packard v. Budaj*, 86 F.4th 859, 864 (10th Cir. 2023). Second, the law must have been clearly established at the time of the alleged conduct such that the defendant had fair notice that his or her conduct was unlawful. *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam). If both inquiries are answered in the affirmative, summary judgment must be denied unless the defendant proves "there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *See Emmett v. Armstrong*, 973 F.3d 1127, 1132 (10th Cir. 2020) (internal quotation marks and citations omitted).

Discerning whether the relevant legal rule was clearly established is a narrow and context-specific exercise. *See Bond*, 595 U.S. at 12; *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam). In short, the precise contours of the legal right must have been so clear that every reasonable official in that circumstance would have understood what he or she was doing violated that right, leaving no debate as to the lawfulness of the conduct in the particular situation. *See Mullenix v. Luna*, 577 U.S. 7, 13–14 (2015); *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Ashcroft v. al-Kidd*, 563 U.S. 731, 740 (2011); *see also Rivas-Villegas*, 595 U.S. at 5–8 (reversing a denial of qualified immunity where the precedent relied upon had "materially distinguishable" facts that "did not give fair notice" to the official).

Practically, this means a "Supreme Court or Tenth Circuit decision" must have held that the same conduct (or very nearly the same conduct) as the conduct at issue is a violation of law. *Wise v. Caffey*, 72

F.4th 1199, 1209 (10th Cir. 2023).[4] To be sure, a case "directly on point" is not necessary for a right to be clearly established, but existing precedent must have placed the constitutional question "beyond debate." *White*, 580 U.S. at 78–79.

Cheatham's claim of deliberate indifference is governed by the Fourteenth Amendment rather than the Eighth because he was a pretrial detainee at the jail. *See Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 307 (10th Cir. 1985). That is a distinction without a difference: Federal courts "apply the same deliberate indifference standard no matter which amendment provides the constitutional basis for the claim." *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020). Generally speaking, the Fourteenth Amendment's guarantee of due process has been construed to obligate the government to provide medical care to both prisoners and pretrial detainees alike. *Id.* And failing to do so—to the extent the defendant(s) were deliberately indifferent—constitutes a violation of that guarantee. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976).

Deliberate indifference "entails something more than mere negligence" but "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1154 (10th Cir. 2022) (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). Deliberate indifference equates "to 'recklessness,' in which 'a person disregards a risk of harm of which he is aware.'" *Id.* (quoting *Verdecia v. Adam*, 327 F.3d 1171, 1175 (10th Cir. 2003)); *see also Counterman v. Colorado*, 600 U.S. 66, 79–80 (2023). It has two components, one part objective and the other subjective. *Strain*, 977 F.3d at 989. The objective component requires a "sufficiently serious" deprivation concerning a medical need that "has been diagnosed by a physician as mandating treatment or one that

---

[4] The Supreme Court has never held that circuit precedent may be a dispositive source of clearly established law, opting instead to assume without deciding that it might. *See City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (citing *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 614 (2015)), which cited *Carroll v. Carman*, 574 U.S. 13, 17 (2014), which, in turn, cited *Reichle*, 566 U.S. at 665–66)); *see also Wilson v. Layne*, 526 U.S. 603, 617 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."). But the Tenth Circuit has, holding that a right "is clearly established when a Supreme Court or Tenth Circuit precedent is on point or the alleged right is clearly established from case law in other circuits." *Stepp v. Lockhart*, __ F.4th __, 2026 WL 586738, at *7 (10th Cir. Mar. 3, 2026).

is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* The subjective component focuses on the defendants' state of mind and awareness, insisting that they knew of and disregarded "an excessive risk to inmate health or safety." *Id.* Abstract risk of harm or danger is not enough. An official must be aware of facts presaging a substantial risk of serious harm and "also draw [that] inference." *Id.*

There are at least two reasons why Cheatham has not shown deliberate indifference.[5] *First*, Cheatham fails the objective component because he did not have a serious medical need. There is no evidence that a physician mandated treatment for Cheatham's finger. *Strain*, 977 F.3d at 989 (explaining that an injury is sufficiently serious if a doctor mandated treatment). The uncontroverted evidence is that several providers evaluated Cheatham's finger over the course of months, performed various imaging scans on the finger, and prescribed Cheatham medicine and therapies. Doc. 297 at ¶¶ 16, 24, 49, 50.

Cheatham's main argument is that Forker mandated surgery for his finger and that the defendants' failure to schedule surgery was deliberate indifference. But that is not what Forker said at all. Forker merely explained to Cheatham what reconstructive surgery would entail and Cheatham decided that he wanted to have the surgery. Docs. 297 at ¶ 37 & 298 at 72. There is no evidence, as Cheatham presumes, that Forker ordered or mandated that surgery must occur, set a time in which it had to occur, or opined that Cheatham would be harmed if surgery was delayed. The absence of that evidence dooms Cheatham's claim. *See Lamb v. Norwood*, 895 F.3d 756, 760 (10th Cir. 2018) (finding no deliberate indifference where prison officials did not authorize surgery, plaintiff received alternative treatment, and noting that "prison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants").

Cheatham's injury was not so obvious that even a lay person would easily recognize the necessity for immediate surgery when that is inconsistent with Forker's conclusion. *See Strain*, 977 F.3d at 994

---

[5] Because Cheatham fails the first prong of the qualified immunity analysis—whether his constitutional rights were violated—it is unnecessary to address the second. *See Est. of Redd by & through Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2017).

(affirming dismissal of a deliberate indifference claim where the complaint failed to allege that the plaintiff's injury was "so obvious that any Defendant should have recognized it and escalated the course of treatment accordingly"). Doctors had to perform an MRI because an x-ray showed that Cheatham's finger was not broken. Doc. 297 at ¶ 16. And his finger was mobile, as he could extend it and make a fist. Doc. 298 at 71. There is no evidence that Cheatham's finger showed outward signs of injury, such as discoloration, bleeding, or deformity. *Cf. Oxendine v. Kaplan*, 241 F.3d 1272, 1278 (10th Cir. 2001) (finding that a finger injury was sufficiently serious after the plaintiff's finger had turned black and was visibly necrotic).

As noted, Cheatham argues that the defendants delayed his medical care, but there is no evidence that Cheatham suffered any harm because of the delay. The uncontroverted evidence is to the contrary: It shows that Forker described what it would take to reconstruct Cheatham's tendon; he indicated no more. Doc. 298 at 72. There is no evidence that Forker said surgery was an emergency, that it was urgently required, or that any delay would cause Cheatham substantial harm. As a result, Cheatham's claim fails. *See Requena v. Roberts*, 893 F.3d 1195, 1216 (10th Cir. 2018) (dismissing claim where the plaintiff did not allege that delay resulted in substantial harm); *cf. McCowan v. Morales*, 945 F.3d 1276, 1291 (10th Cir. 2019) (affirming denial of motion to dismiss where the plaintiff alleged that a delay in treatment resulted in substantial harm).

This result is contrary to that reached at the motion-to-dismiss stage. The defendants' motion to dismiss Cheatham's deliberate indifference claim was denied because Cheatham alleged that a surgeon mandated surgery for his finger and that the defendants failed to adhere to that medical direction. Doc. 98 at 12. That allegation had to be accepted as true at the motion-to-dismiss stage. *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). But to defeat a motion for summary judgment, Cheatham has to offer evidence in support of his allegation that a surgeon mandated surgery. *Adler*, 144 F.3d at 671. He has not done so, and the evidence is to the contrary. Cheatham points to notes from his visit with Forker that show his finger condition was chronic, that there would be benefits to surgery, and that he was interested in surgery. Doc. 304 at 22–23. But absent from Forker's notes or any other medical record is any indication that surgery was *required* and that it had to happen immediately. Simply put, Forker did not mandate surgery for Cheatham's finger. Forker's notes

11

show that reconstructive surgery for Cheatham's finger was elective. Doc. 298 at 70–72. Cheatham's stringent desire to have surgery does not mean that Forker mandated surgery or that Cheatham had a serious medical need.

*Second*, Cheatham lacks evidence necessary to sustain his burden of satisfying the subjective component. Specifically, there is no evidence that the defendants knew of and disregarded an excessive risk to his health and safety. The evidence is to the contrary. Cheatham received treatment for his finger on numerous occasions. For example, he received three x-ray scans, all of which showed that his finger had no fractures. Doc. 297 at ¶¶ 16, 49, 50. He was evaluated roughly seven times over the course of twelve months for complaints about his finger, and in none of these evaluations was it obvious that Cheatham's finger posed an excessive risk to his health or safety. *Id.* at ¶¶ 19, 20, 24, 25, 34, 42, 51. Jail staff also addressed Cheatham's complaints by prescribing him medication and therapy exercises. *Id.* at ¶ 24. On this record, Cheatham's claim fails because he lacks any evidence showing that any one of the individual defendants knew about and then consciously disregarded excessive risks to his health or safety. *See Strain*, 977 F.3d at 995 (finding that where the defendants "provided several physical and mental health assessments to [the plaintiff], placed him on two forms of medication, and kept him under routine observation," such facts "do not evidence deliberate indifference"); *Self v. Crum*, 439 F.3d 1227, 1232–33 (10th Cir. 2006) ("[W]here a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted under our case law.").

### III

For the foregoing reasons, Cheatham's Motion for Summary Judgment, Doc. 293, is DENIED, and his Motion for Order, Doc. 360, is DENIED AS MOOT. Defendants Beck, Dedeke, and Wardrop's Motions for Summary Judgment, Docs. 296 and 301, are GRANTED.

It is so ordered.

Date: March 31, 2026          s/ Toby Crouse

Toby Crouse
United States District Judge

12